## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VAUGHN L. BENNETT

     Plaintiff

v.                                Case No: 5CV2225 (RJL)

UNITED STATES OF AMERICA
CHESS FEDERATION (USCF), et al,

     Defendants

### PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Now comes the Plaintiff, Vaughn L. Bennett, pro se, and opposes the Defendants'

USCF, John McCrary, Timothy Redman, Timothy Just, Boyd Reed, William Goichberg,

Wayne Clark, and Gregory Vasserstein's Motion to Dismiss, and as grounds therefore

states as follows:

**Defendants' Preliminary Statement**

Paragraph #1 in the Preliminary Statement of Defendants' Motion states;

"Plaintiff taught some of these individuals in his capacity as executive director of

Olympic Chess House (OCH), a nonprofit organization, **wholly separate and apart**

**from USCF or any of the Defendants** at issue." The Plaintiff respectfully states that this

is not an accurate statement. Since approximately 2000 Plaintiff has been a card-carrying

member of the USCF. In or about July of 2004, Plaintiff was duly elected as the D.C.

Delegate to the USCF. Plaintiff is the only Black African-American Delegate to the

USCF. In the capacity of official USCF tournament director and as a member of the

USCF, Plaintiff has run many USCF sanctioned chess tournaments in Washington, D.C.

The Plaintiff "taught" at all of the chess tournaments that he ran. Plaintiff has taken

1

children to compete in USCF sanctioned tournaments locally, regionally, and nationally. At every USCF sanctioned tournament that Plaintiff has attended with the children, he "taught" as a member of the USCF.

During its existence, OCH was a dues paying, Washington, D.C., affiliate of the USCF. By paying mandatory USCF fees, many of the D.C. children, youth, and adults that Plaintiff "taught" became dues paying members of the USCF, via OCH. Additionally, as a USCF affiliate, OCH gave several USCF sanctioned tournaments in Washington, D.C., which required that USCF tournament and membership fees were paid to the USCF by OCH.

Paragraph #2 in the Preliminary Statement of Defendant's Motion states, " . . .the USCF (a *private* nonprofit organization) . . ." The Plaintiff respectfully states that this is not an accurate statement. The USCF is **not** "a *private* nonprofit organization". The USCF is a membership type of organization open to any member of the public to join upon payment of fees; therefore the USCF is not a "*private*" organization.

Also paragraph #2 states, " . . .defendants discriminated against Black African-American and Vietnamese players by not delegating one as the representative of the District of Columbia in the Denker chess tournament."

The Denker Tournament of High School Champions is a tournament where each state sends their high school chess champion to compete. Usually, each state conducts qualifying chess competitions that ultimately produce a state high school champion. The process of determining the state champion is supposed to be fair, equitable, and accessible. The process is not to be one of an unfair, arbitrary, and racially biased

delegation, such as in the District of Columbia. (See Plaintiff's Affidavit paragraphs 6-14)

Due to a racially discriminatory Denker process, the Defendants have denied the Plaintiff particular professional opportunities in the business of chess while allowing free access to Caucasian chess promoters. These opportunities include but are not limited to:

a.    Denying Plaintiff the business opportunity and prestige of hosting the qualifying tournament, as abdicated to do so by the D.C. BOE.

b.    Denying Plaintiff the business opportunity and prestige of having his (Plaintiffs) students represent the District of Columbia and win a scholarships.

The first sentence of paragraph #3 in the Preliminary Statement of Defendants' Motion states that, "Plaintiff claims that, instead of "appointing" a Black African-American or a Vietnamese individual, USCF conspired with USCCF and David Mehler to ensure that his son and daughter were among the highest rated chess players in the country." Plaintiff never made the aforementioned quoted statement. Respectfully, the Plaintiff believes that Defendants' Counsel has the issues confused.

Plaintiff's Complaint makes no statement or claim whatsoever of, "appointing", a Black African-American or a Vietnamese individual. Paragraphs 33a, 34, 35, 36, 37, 38, and 41 of Plaintiff's Complaint discuss the racist scheme, (that Plaintiff spoke out about), to deny Black African-American and Vietnamese children access to the professional and educational benefits of the game of chess.

Paragraph 33c of Plaintiff's Complaint addresses the Plaintiff exercising his free speech rights to speak out about an on-going fraudulent scheme involving the manipulation of the USCF's performance evaluation (chess rating) system. Defendants

USCF, USCCF, and Attorney David Mehler conspired to make Sarah Mehler, (when she was one (1) year old), the highest rated chess player in world history! To this day, Sarah Mehler's fraudulent performance evaluation of 3019 is still promoted as truth on the USCF website and the USCCF website.

By again, manipulating the USCF's performance evaluation/chess rating system, Defendants USCF, USCCF, and Attorney David Mehler also conspired to make John Mehler, (when he was eight (8) months old), one of the highest rated chess players in the world with a fraudulent rating of 2538. To this day, John Mehler's fraudulent performance evaluation of 2538 is still promoted as truth on the USCF website.

Respectfully, footnote #2, on page #2 of Defendants' Motion incorrectly attributes the statement of, "appointing", to the Plaintiff. This is again, respectfully, a confusing of the issues by Defendants. Plaintiff has never stated that participants at the Denker are appointed.

Paragraph #2, of footnote #3, of Defendants' Motion states, "plaintiff does not have standing to bring suit against USCF under Title VI of the Civil Rights Act of 1964. 42 U.S.C.A. § 2000d states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program of activity receiving Federal financial assistance." Id. USCF does not, nor does plaintiff contend, that it receives any federal financial assistance. Because plaintiff was merely a member of an organization who did not receive any federal funding he is not a beneficiary of federal funds and therefore does not have standing to raise such a claim."

Plaintiff respectfully states that the aforementioned statement is not true. The

USCF does receive significant federal financial assistance in the form of IRS tax

exemptions, federal grant monies, and donations of land. (See Plaintiff's Affidavit

paragraphs 2-4) Plaintiff does have standing to bring suit against USCF under Title VI of

the Civil Rights Act of 1964.

**Plaintiff has standing to bring his Claims for Discrimination**

The first paragraph on page #3 of Defendant's Motion states, "Accordingly, he

has no standing to make a claim on their behalf."

Plaintiff has filed his complaint under 42 U.S.C. § 1982 which says that "[a]ll

citizens of the United States" are to be protected against discrimination. In *Sullivan v.*

*Little Hunting Park, Inc.*, 396 U.S. 229 (1969), a white (Caucasian) plaintiff had standing

under § 1982 to redress expulsion from corporation organized to operate a community

park and playground facilities for the benefit of the area residents after being refused

approval of an assignment of his lease because of the assignee's race, on whose behalf

the plaintiff had advocated.

Additionally, "Limiting standing under the District of Columbia Human rights

Act (DCHRA) to only the direct targets of discrimination would limit the flexibility of

the DCHRA as a tool to eliminate discrimination and hamstring efforts to effect the

statute's broad purpose. That a plaintiff's alleged injury is predicated upon discrimination

against a person other than him or herself presents a jury question as to whether an

"unlawful discriminatory practice" occurred and whether the plaintiff was thereby

"aggrieved"; *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp., 749 A. 2d 724 (D.C.*

*2000)*.

Plaintiff has referenced the plight of the children and others as evidence of the continuing system of racial discrimination that he (Plaintiff) was subjected to and suffered from. Plaintiff additionally has referenced the children and others as evidence of how he is adversely affected by the racist USCF system. Plaintiff's allegations of third-party injury are legally sufficient to survive a motion to dismiss.

### Plaintiff's Civil Rights Claims are <u>not</u> Barred by the Statutes of Limitations Due to the Continuing Violation Theory

Plaintiff's Complaint speaks to a discriminatory system where each discriminatory act pursuant to that system is a new act of discrimination -- a continuing violation -- where the USCF's racially discriminatory policies, practices, and patterns have continued into the statutory period. *Bazemore v. Friday, 478 U.S. 385 (1986)*. "In this circuit, it has been held that plaintiff[s] may litigate claims under the continuing violation theory . . . if [they] can prove either a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the statutory period." *Haynie v. Veneman, 272 F. Supp. 2d. 10, 15 (D.D.C. 2003)* (quoting *Anderson v. Zubieta, 180 F.3d 329, 336 (D.C. Cir.1999))*. Also see *Torres v. Mineta, 2005 U.S. Dist. LEXIS 10151*. Plaintiff's Complaint clearly cites a continuing series of related racially discriminatory acts that are products of a discriminatory system. The blatant acts of racism were perpetrated by the named Defendants, (all of whom are USCF members), from August 2001 to November 2004. Plaintiff continues to suffer from the effects of Defendants maintaining a discriminatory system.

**Plaintiff's Claims of Defamation and False Imprisonment**

Plaintiff's claims of false imprisonment and defamation are timely in that

Plaintiff, "in the exercise of due diligence", initially filed suit in D.C Superior Court, in

2002, in order to address them. The 2002 lawsuit was filed against the US Chess Center

Foundation, David Mehler, et al. A Motion for Reconsideration is currently pending in

the 2002 action. Plaintiff believes that, (due to his Motion for Reconsideration being

unopposed by Defendant Attorney David Mehler), his Motion for Reconsideration will be

granted. (Upon Plaintiff's claims being reinstated in DC Superior Court, he will move to

have them dismissed without prejudice, in order to properly litigate his claims in this

Court.)

On November 16, 2004, Defendants Chess Central, Timothy Just, Wayne Clark,

BMR Design, Boyd Reed, William Goichberg, and others; pursuant to the USCF's

system of racism and discrimination; engaged in the developed and implementation of a

scheme to continue the defamation of Plaintiff. (See attached letters 1-3) The scheme was

developed via regular mail, email, and in telephone meetings. Plaintiffs claim was timely

filed on November 16, 2005, within the one-year statute of limitations.

**Plaintiff's Claim of Intentional Infliction of Emotional Distress**

Plaintiff's claim for intentional infliction of emotional distress is not

time-barred. His claim arises from (but is not limited to):

a.    Being subjected to the USCF's, (et al), extreme, outrageous and

continuing system of race discrimination, coupled with the intentional ongoing

denial of Plaintiff's human and civil rights; and knowing that the children that he

teaches and coaches are intentionally being racially discriminated against, year

after year; causes the Plaintiff severe emotion distress: as Plaintiff is in full view of the children's legacy being stolen.

      b.    Defendant Mehler's extreme and outrageous conduct of falsely labeling Plaintiff as a, "vicious thug with a substantial history of dishonesty", intentionally causes the Plaintiff severe emotional distress: as Plaintiff must constantly face individuals, who are aware of this defamatory statement.

      c.    Defendants USCF, Chess Central, and Just's extreme and outrageous conduct of racial discrimination by forfeiting the games of the children on Plaintiff's team, after Plaintiff had coached the children in a national chess tournament for three days, intentionally caused the Plaintiff severe emotional distress.

      d.    Defendant Chess Central's, and Just's extreme and outrageous conduct of calling the Plaintiff a, "Nigger", in front of hundreds of children and adults intentionally caused the Plaintiff severe emotional distress. Plaintiff had to withstand the shame and stigma of slavery associated with being called "Nigger" in addition to being told to leave the chess tournament because of racism.

      e.  Defendants Chess Central and Just conspiring with the other Defendants to defame Plaintiff's name by falsely claiming that Plaintiff, "punched", "assaulted", and "attacked" him, (ultimately causing the Plaintiff's suspension from the USCF, see attached letter #4), was extreme and outrageous conduct which intentionally caused the Plaintiff severe emotional distress.

**This Court has Personal Jurisdiction over the Individual Defendants**

Defendants transact quite a bit of business in the District of Columbia. The following is a list that includes, (but is not limited to), business activities and contacts that the Defendant's have with the District of Columbia (See Plaintiff's Affidavit paragraphs 2-4):

- There are approximately two hundred (200) or more membership fee-paying members of the USCF who are live in the District of Columbia. Each adult member must pay the USCF $49.00 per year, each youth must pay the USCF $25.00 per year, and each child must pay the USCF $19.00 per year.

- There are at approximately ten (10) USCF affiliates in the District of Columbia. Each USCF affiliate must pay a membership fee of $40.00.

- Each USCF affiliate in the District of Columbia that gives a USCF sanctioned tournament must pay tournament fees to the USCF. (See Plaintiffs Affidavit)

- Each USCF affiliate in the District of Columbia that signs up a new member must send the membership fees (minus two dollars for the affiliate) to the USCF.

- For nine years, the District of Columbia was a rent and tax-free home to the USCF's museum, the "U.S. Chess Hall of Fame".

- The USCF purposefully solicits District of Columbia residents for membership.

9

The aforementioned bullet points are "specific facts that demonstrate purposeful activity by the defendant in the District of Columbia invoking the benefits and protections of its laws." *Helmer v. Doletskaya*, 290 F.Supp 2d 61, 66 (D.D.C.2003) *rev'd on other grounds, Helmer v. Doletskaya*, 393 F.3d 201 (D.C.Cir2004).

"Under the due process clause, the minimum contacts principle for the court's exercise of personal jurisdiction over nonresident defendant requires court to examine the quality and nature of defendant's contacts with District of Columbia and whether those contacts are voluntary and deliberate or only random, fortuitous, tenuous, and accidental." "District of Columbia long-arm statute is coextensive in reach with personal jurisdiction allowed by due process clause." *Shoppers Food Warehouse v. Asuncion Moreno*, 746 A.2d 320 (D.C.2000).

The USCF's policy of membership and tournament fee collection from individuals and affiliates in the District of Columbia, (in addition to sharing fees with District of Columbia USCF affiliates), clearly establish that the USCF's contacts with the District of Columbia are "voluntary and deliberate".

**Illinois law does not give Defendants immunity.**

Plaintiff respectfully states that none of the Defendants are subject to Illinois law. This is due to, (including but not limited to), the fact that since the USCF's incorporation in 1939, its (USCF's) primary place of business, for sixty-five (65) years has been in the state of New York, until 2004, when the headquarters was moved to Crossville, Tennessee (See Plaintiff's attached Affidavit paragraphs 2-4).

Even assuming *arguendo* that the Defendants claim, (regarding immunity via Illinois law) was applicable, the plain language of the Illinois law cited by Defendants, ".

. . .unless the act or omission involved willful or wanton conduct.", precludes Defendants

from using it as a Defense. Willful or wanton conduct is described as "a course of action

which shows an actual or deliberate intention to cause harm or which, if not intentional,

shows an utter indifference to or conscious disregard for the safety of other or their

property."

Defendants engaged in a "course of action which shows an actual of deliberate

intention to cause harm or which, if not intentional shows an utter indifference to or

conscious disregard", by (including but not limited to):

- Dismissing and not responding Plaintiff's claims of racial discrimination.

- Engaging in schemes of retaliatory defamation against Plaintiff.

- Developing, implementing, and sustaining a racially discriminatory
  system designed to deny Plaintiff the professional and educational benefits
  of the game of chess, while providing similarly situated Caucasians open
  access.

Defendants should not be cloaked with immunity by citing Illinois law.

**Plaintiff states claim against Defendants pursuant to Fed.R.Civ.P. 12(b)(6)**

Plaintiff has named Thomas Brownscombe, William Goichberg, John McCrary

and Timothy Redman as Defendants due to the fact that they were and are policy/decision

makers for the USCF, all of whom Plaintiff had sought help from. Brownscombe,

Goichberg, McCrary and Redman's positions of authority within the USCF gave them

responsibilities and duties to address issues of racism and discrimination. Disregarding

and ignoring Plaintiffs claims of racial discrimination was a breech of Brownscombe,

Goichberg, McCrary and Redman's responsibility and duty to act. Their high-ranking

roles within the USCF, and the accompanying negligence has fostered, fueled, and fanned the flames of racism and discrimination continuously directed at the Plaintiff.

Defendants Boyd Reed and BMR Design have willingly participated (along with Defendants Chess Central, Just, Vasserstein, Clark, and others) in a retaliatory conspiracy of defamation that has intentionally caused the Plaintiff suffering. On or about November 23, 2004, Defendant Reed had a meeting of the minds, via telephone with Defendant Just; and as a result, BMR Design and Reed wrote a defamatory letter (concerning the Plaintiff) to then, USCF Executive Director, William Goichberg. (See attached letter #3)

**Plaintiff's Section 1981 claims.**

Paragraph 34 of Plaintiff's Complaint provides several facts to support his claim of a "racist discriminatory scheme":

- "Since 1988, the Defendant's scheme has kept Black African-American and Vietnamese children, who had won the title of D.C. High School Champion, from representing the D.C. at the most prestigious scholastic tournament in the United States, the Arnold Denker Tournament of High School Champions (the Denker)."

- "The Defendants, especially Attorney Mehler, through an unfair and inequitable process, had ensured that only a Caucasian child, Johnny Sadoff, (also the son of USCCF board member and registered agent, Elizabeth Sadoff), represented D.C. at the Denker from, (then), 1998–2001."

Paragraph 35 of Plaintiff's Complaint provides more facts to support his claim of a "racist discriminatory scheme":

12

- "With knowledge of the fact that from, 1998-2001, the titled and trophy holding D.C. High School Champion had been either Black African-American or Vietnamese, Plaintiff became direly concerned about Black African-American and Vietnamese children being denied access to chess scholarships, especially since no Black African-American child had ever won a full chess scholarship, (though at least twenty three universities offer full or partial chess scholarships)." (See Plaintiff's Affidavit #12)

- "He also was troubled by the adverse impact of the blatant, racially motivated scheme to deny minority children, (many of whom were the Plaintiff's students), chess scholarships."

On numerous occasions, Plaintiff communicated his concerns of racism with various members of the USCF, including the above Defendants. Plaintiff states that Defendants had a responsibility and duty, as policy/decision makers of the USCF to investigate and address Plaintiff's claims of race discrimination. Defendants' failure to take action has encouraged the continuation of the system of racial discrimination that Plaintiff was subjected to.

In paragraph 50 of Plaintiff's Complaint, Plaintiff describes his attempt, (on or about October 2002), to request the USCF tournament directing services of Mike Atkins. Plaintiff approached Atkins while he was in the performance of his official USCF duties; running the D.C. Open, a USCF sanctioned, chess tournament. The Plaintiff made his request to Atkins in order to pursue a business opportunity in which he (Plaintiff) would host a USCF sanctioned tournament with one thousand (1000) children participating. Atkins, (while in performance of his USCF duties), immediately refused to officiate any

of Plaintiff's tournaments, because of what Defendant Attorney Mehler had said about Plaintiff.

In paragraph 51 of Plaintiff's Complaint, Plaintiff clearly describes how the USCF performance evaluation system permits discrimination on the basis of race and color in evaluations/chess-ratings where scholarships, cash prizes, master titles, as well as further advancement within the sport of chess, are based on evaluations/chess-ratings pursuant to USCF written policies. Plaintiff also describes in 51 how the undue discretion of tournament directors and tournament organizers is the direct cause of Plaintiff and other Black African-American adults and children receiving lower ratings than Caucasians, and fewer high ratings. When Plaintiff joined the USCF in the year 2000, his USCF performance evaluation was over two hundred points lower than when he was last a member of the USCF, with no explanation. Caucasian chess players are not subjected to the lowering of their performance evaluation, with no explanation. There is no factor (such as age, experience, or similar factors) that could explain this race based or color based difference in performance evaluations.

Paragraphs 52-53 in Plaintiff's Complaint address a blatant act of race discrimination. Defendant Singhal, while acting in his capacity as a USCF tournament director, chose to give the Plaintiff and his team a second place trophy; intentionally denying Plaintiff and his team the first place trophy that they had rightfully earned. Defendant Singhal racially discriminated by wrongfully awarding a team of Caucasians the first place trophy that Plaintiff and his team deserved. Plaintiff and his team were the only were the only Black African-Americans that participated in the tournament, and had the best record of the Middle School teams. There is no factor (such as age, experience,

14

or similar factors) that could explain this race based or color based difference in denying Plaintiff and his team the first place trophy.

Paragraph 55 of Plaintiff's Complaint, speaks to the Howard University chess team being intentionally cheated by the USCF's performance evaluation system, due to racial discrimination. The USCF used false performance evaluations to keep HU out of placing in a higher category. Plaintiff was the coach of the HU chess team in 2003. There is no factor (such as age, experience, or similar factors) that could explain this race based or color based difference in denying Plaintiff and his HU team the opportunity to place in a higher category.

Plaintiff's Complaint sets forth facts that provide basis to support a reasonable inference that the USCF and the above named individual Defendants interfered with his right to make and enforce contracts due to racial discrimination.

**Plaintiff's First Amendment and Section 1983 Claims**

Defendant USCF is a defacto actor of the US Government. (See Plaintiff's Affidavit, "The USCF and how the USCF is linked with the US government.") Therefore Plaintiff's First Amendment and 42 U.S.C.A. § 1983 Claims are properly stated as Defendants have acted under color of state law.

**Plaintiff's Section 1982 Claims**

Plaintiff's Complaint properly alleges violations of 42 U.S.C.A. § 1982 when he was falsely arrested on the premises of the USCCF and was told to leave the tournament in Hershey Park. The USCCF is a defacto actor of the District of Columbia Government. (See Plaintiff's Affidavit, "The USCCF and how the USCF is linked to the District of Columbia Government.") Plaintiff was denied his property rights in his right to hold

space at the USCCF and in Hershey Park. Hershey Park and the USCCF are places of

public accommodation.

**Plaintiff's Section 1983 Claims**

The USCF a Defacto state actor, by and through its members and officers,

(including but not limited to), Defendants Brownscombe, Goichberg, McCrary, Redman,

Mehler, the USCCF, and others, either participated in the scheme to have Plaintiff falsely

arrested, and or failed to act to stop the racially discriminatory circumstances that caused

Plaintiff to be falsely arrested.

**Plaintiff was retaliated against for exercising his free speech rights on an issue of
public concern**

As a result of Plaintiff exercising his First Amendment rights of free speech, he

was retaliated against by the above named Defendants.

"It is well established that civil rights statutes should be read expansively in order

to fulfill their purpose." *Griffin v. Breckenridge*, 403 U.S. 88

**Plaintiff's Claim of Defamation Per Se**

Respectfully, Defendants incorrectly claim that Plaintiff's claim is time-barred.

Defendants initiated their conspiracy of defamation of November 16, 2004 (See Timothy

Just's letter attachment #1). Plaintiff timely filed his Complaint on November 16, 2005.

The defamatory statements that were made and perpetuated about Plaintiff were clearly

not made as officials of USCF to other officials of the USCF.

Defendant Chess Central is an Illinois, for-profit, corporation. Defendant Just, in a

pleading (Motion to Dismiss) to this Honorable Court emphatically stated that, **"Chess

Central is the employee of the USCF"** and that, **"[USCF] Fees are paid to the

corporation [Chess Central], and Mr. Just is paid therefrom."** Timothy Just was

acting as an employee of Chess Central, **not** the USCF. Therefore, the Defendants arguments of "intracorporate conspiracy doctrine," do not apply. Defendant Just published the defamatory statements without privilege as he was, again, not an employee of the USCF. Just was acting as an employee of Chess Central (a for-profit corporation).

Plaintiff did not punch, attack, or assault Defendant Just. Plaintiff, coming to the aid of a child who was being abused by Defendant Just, simply ushered Just away from the child. Ultimately, it was Just who was "detained" by the Hershey Park Police and given a citation for his behavior.

Plaintiff has stated a claim of defamation against above named Defendants.

**Plaintiff's false imprisonment claims.**

Plaintiff's claims for false imprisonment are not time-barred as this malicious act was done in continuance of the USCF's system of racial discrimination, "Continuing violation theory."

**Plaintiff's Section 1985 claims.**

Plaintiff's claims of a race based conspiracy are correct in that Defendant Timothy Just was acting **not** as an employee of the USCF, but as an employee of Chess Central, an Illinois for-profit corporation. Thus Defendants arguments are moot.

**Plaintiff's Section 1986 claims.**

As Plaintiff's Section 1985 must not fail, neither should his Section 1986 claim.

**There is direct evidence of discrimination.**

Based on the aforementioned statements, Plaintiff emphatically states that the record contains direct evidence of discrimination.

**Dismissal is premature.**

Dismissal is premature, as no discovery has yet been conducted. Plaintiff believes proper discovery would produce evidence that would not only conclusively, prove his claims; but that much broader race based conspiracy, against Plaintiff would be exposed.

**Defendants have not given a non-discriminatory reason for their actions.**

Defendants have not articulated a legitimate non-discriminatory reason for their actions. As such, Plaintiff's *prima facie* case of discrimination is unchallenged.

## CONCLUSION

Plaintiff has stated claims against Defendants upon which relief may be granted. For all of the foregoing reasons, Plaintiff respectfully requests that Defendants Motion to Dismiss be denied.

Respectfully submitted,

Vaughn L. Bennett, pro se
2520 10th Street, N.E., #27
Washington, D.C. 20018
Telephone: (202)351-2627

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION** was mailed, first class and postage prepaid this 13th day of February, 2006 to:

Colleen Durbin, Esquire
1615 'L' Street, N.W., Suite 500
Washington, D.C. 20036

Vaughn Lee Bennett

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VAUGHN L. BENNETT

      Plaintiff

v.                                         Case No: 5CV2225 (RJL)

UNITED STATES OF AMERICA
CHESS FEDERATION (USCF), et al,

      Defendants

## AFFIDAVIT OF VAUGHN L. BENNETT

I, Vaughn L. Bennett of 2520 10th Street, N.E., #27, Washington, D.C., state as follows:

**Affiant.**

1.     I am a Black African-American chess promoter, instructor, and coach. I am also a member of the USCF and currently the only Black African-American, duly elected, delegate (District of Columbia), to the USCF in the world. I am the claimant in the present action. I make this affidavit in support of my Opposition to Defendants USCF, John McCrary, Timothy Redman, Timothy Just, Boyd Reed, William Goichberg, Wayne Clark, Thomas Brownscombe, and Gregory Vasserstein's Motion to Dismiss. The matters set out in this affidavit are within my personal knowledge and are true to the best of knowledge and belief.

**The USCF and how the USCF is linked with the US government.**

2.     The USCF is the national governing body of chess in the United States. It is a nonprofit amateur and professional sport [chess] organization, which acts as this country's representative in the international chess federation, Federation International Des Echec (FIDE). It sets goals and directs policy in the sport [chess]. It also governs and

has the power to sanction internal chess competitions held in the U.S. The USCF is an IRS 501 (c) (4), tax-exempt, social organization. In 1939, the USCF was incorporated in the state of Illinois and headquartered in the state of New York. The USCF has affiliates in each of the fifty states. Each affiliate pays membership fees, tournament fees, etc., to the USCF. The primary place of business for the USCF remained in the state of New York for sixty-five (65) years until 2004 when it was moved to Crossville, Tennessee.

3.      There is a joining at the hip of the USCF and the US Government. The USCF, with its multimillion-dollar budget, enjoys the benefit of significant US Government financial assistance in the form of tax exemption, (being recognized as an IRS 501 (c) (4), social organization), and indirect or direct receipt of federal grant funds. The USCF enjoys the US Government benefit of being authorized as the sole sanctioning body of chess in the U.S. Additionally, the USCF also enjoys a large percentage of its operating space due to the city government of Crossville, Tennessee recently making a donation of three (3) acres of land to the USCF.

4.      The US Government benefits from its relationship with the USCF because the USCF takes on the US Government duties, responsibilities, and activities of representation in the international chess federation, Federation International Des Echec (FIDE). The USCF further takes on US Government duties, responsibilities, and activities by conducting qualifying competitions that ultimately determine who will represent the United States in world/international competition, including the Olympics. The USCF sets goals and directs policy for the sport of chess in the U.S. The USCF also governs, and is the only sanctioning body for, internal chess competitions held in the U.S.

**Bennett's recent history with the USCF.**

5.    In 2000, I joined the USCF as a dues paying member, attending and participating in various USCF sanctioned activities. Later, I became a USCF sanctioned tournament director, and directed several USCF sanctioned tournaments. I also was executive director of Olympic Chess House, a USCF affiliate. I advocated many children, schools and organizations, where I taught chess, to join the USCF and become dues paying members and affiliates. I received praise and commendation for my chess teaching skill and dedication to the community – in the form of, but not limited to, – positive write-ups in news articles, radio and television interviews, even receiving a resolution from the DC BOE recognizing my work with special needs children.

**Bennett speaks out about racism and discrimination in chess.**

6.    During my membership with the USCF, I vocally opposed numerous practices and procedures that I believed to be racial discrimination within the USCF, including the inequitable treatment of Black African-American adult and child chess players. In particular, from May 2001until present, in both telephone conversation and letters to the management of the USCF, statements to members of the public, elected off and media, I spoke out on a broad range of matters concerning race discrimination and illegal activities, including (but not limited to) the following instances:

7.    On or around April of 2001, I discovered an ongoing, racially motivated scheme, designed by defendants USCF, USCCF, DCCL, Brownscombe, Redman, McCrary, Attorney Mehler, Mikell and Cohen; to deny Black African-American and Vietnamese children, (who had won the title of D.C. High School Champion) the opportunity to win

3

chess scholarships by representing the District of Columbia at the Arnold Denker
Tournament of High School Champions (Denker).

8.    The Denker, where each state sends their state high school champion to compete,
is the most prestigious scholastic chess tournament in the United States. The top four
finishers of the Denker tournament are awarded scholarships from the USCF totaling
$1,000.00. In addition to the USCF scholarships, in the year 2000, the University of
Texas at Dallas awarded five scholarships, valued at $30,000.00 each, to the winners of
the Denker. Ultimately, the Champion of the Denker is awarded the right to represent the
U.S. in World competition. There has never been a Black African-American winner of
the Denker.

9.    I discovered that since 1988, no Black African-American child has represented
Washington, D.C. at the Denker. I also discovered that since 1998, the Denker
representative for D.C. had been the same Caucasian child, Johnny Sadoff, the son of
USCCF board member/registered agent Elizabeth Sadoff. Johnny [Sadoff] never
competed for the title of D.C. high school champion, but ultimately represented D.C. at
the Denker five years in a row, never winning. There is no other person in the entire
world that has ever played in the Denker five years in a row.

10.    On or about May 3rd, 2001, I had a telephone conversation with, then USCF
Scholastic Coordinator, Defendant Thomas Brownscombe. During or conversation I
expressed my concerns about how racist it was for Black African-American children in
D.C. to be wrongfully denied the opportunity to represent D.C. and win chess
scholarships. Defendant Brownscombe proudly told the Plaintiff that Johnny Sadoff was
the only D.C. high school student that had competed in Mehler's "qualifier". Defendant

Brownscombe informed the Plaintiff that Mehler had already submitted the documentation that identified Johnny Sadoff as the D.C. representative to the Denker for the fourth year in a row. Brownscombe also stated that the DCCL makes the determination President Defendant Mikell also is the treasurer and registered agent of the USCCF. In 2001, the DCCL's official address was 1501 'M' Street NW, Washington, D.C., the same address as the USCCF.)

11.    I wrote private email letters titled to various management officials of the USCF, including but not limited to, defendants USCF presidents Redman and McCrary. My email letters expressed my concern over the clear lack of fairness and justice implications that accompanied the facts that: the student population of the District of Columbia Public Schools is approximately 90+% Black African-American; and that since 1988, no Black African-American child has represented Washington, D.C. at the Denker Tournament of High School Champions. The letters to Defendants Redman and McCrary also detailed the racially discriminatory conditions he (Plaintiff) and other Black African-American adults and children were subjected to. On or about May 19, 2001, Defendant Redman responded to the my letter and said that, "I have asked the Scholastic Director of the U.S. Chess Federation to look into this most troubling accusation." Defendant McCrary responded to my letter on or about May 19, 2001. McCrary said, "I do know David Mehler and he is not a racist." On several occasions at USCF events, I approached and spoke with Defendant Goichberg regarding racial bias and disparate treatment, which could not have been easily overlooked.

12.    With knowledge of the fact that from, 1998-2001, the titled and trophy holding D.C. High School Champion had been either Black African-American or Vietnamese, yet

never represented D.C. at the Denker, I became direly concerned about the adverse

impact of the blatant, racially motivated scheme to deny minority children, (many of

whom were the my students), chess scholarships. Ultimately, as the children could not

stand up for their rights, I was compelled to speak out publicly about these injustices that

I perceived as a form of child abuse and or neglect.

13.    I informed elected D.C. Public School Administrators, D.C. Council members and

D.C. Board of Education members about the conspiracy to deny minority children,

especially Black African-American children, the right to represent Washington, D.C. in

national competitions and win full scholarships to college.

14.    On or about September of 2001, I attempted to reach, then, USCF President

McCrary via telephone. I called the USCF headquarters in New York and spoke with

USCF Assistant Secretary Ms. Barbara Vandermark. I left a message with Ms.

Vandermark for Mr. McCrary expressing my concerns about the system of racial

discrimination that the USCF was engaging in and that David Mehler had been retaliating

against me for speaking out about it. I also asked Ms. Vandermark if she would have Mr.

McCrary call me. McCrary never called nor did McCrary ever take any action to address

my complaints of racial discrimination.

**Denial of Contracts to Bennett.**

15.    On August 8, 2001, the District of Columbia Board of Education, at a special

board meeting, unanimously passed a Resolution in order to stop the blatant system of

racial discrimination, and unfair practice of having only White Caucasian children who

**had not won** the title and trophy of D.C. High School Chess Champion, represent

Washington, D.C. at national chess tournaments where scholarships can be won: Denying

6

Black African-American and Vietnamese children, who **have won** the title and trophy of D.C. High School Chess Champion are intentionally being denied equal access to representing Washington, D.C. at national chess tournaments where scholarships can be won.

16.    The resolution that the BOE passed stated that the BOE would be the "sole entity" to certify who would represent the District of Columbia at the Denker Tournament of High School Champions.

17.    Despite the DC BOE's resolution, Mehler, Mikell, the DCCL, and the USCCF today continue their ongoing conspiracy to deny Black African-American and Vietnamese children access to tournaments where they (the children) would win scholarships.

18.    Because of the aforementioned scheme of racial discrimination, I have been denied access to contracts:

19.    In or about May of 2002, I was publicly authorized by the DC BOE to give the qualifying tournament that would determine the champion who would represent the District of Columbia at the Denker. In fact, BOE President Peggy Cooper Cafritz publicly stated that my organization (OCH) and myself would give the tournament to determine who the DC representative to the Denker would be. Mehler ignored the BOE's resolution and their delegation of duties to my organization. He (Mehler), Ralph Mikell, Harry Cohen, the DCCL, the USCF, and the USCCF continued the unfair, racist policy of denying Plaintiff's students, (many of whom were champions), the right to represent Washington, D.C.

7

20.     This ongoing, racially discriminatory scheme, personally denied me opportunities by subjecting me to a lower status and lower recognition as a chess promoter, instructor, and coach: whereas Caucasian chess promoters, instructors, and coaches are not subject to lower status. More specifically, because my students that I teach and coach are racially denied the opportunity to win championships and scholarships, and the accompanying prestige, I am racially denied status, recognition, and business opportunities as a chess promoter, teacher, and coach: whereas the status, recognition, and business opportunities of Caucasian chess promoters, teachers, and coaches are not denied. I am affected by the USCF's racist scheme because my Black African-American and Vietnamese students, that would have won chess scholarships, were and are being denied access to chess tournaments where they would have won scholarships; while Caucasian students of Caucasian chess coaches were given access. This racially discriminatory policy has negatively affected my ability to do the business of teaching chess, as my students are subjected to a racist glass ceiling on their opportunities to benefit professionally and educationally.  As a result of the glass ceiling my students have been and are being discouraged from playing chess (while Caucasian students are encouraged to play). Ultimately, as a result, my credibility as an instructor, coach, and chess promoter was and is negatively affected. I have suffered by not being able to continue teaching, coaching, and promoting chess, because my students, due to the racist system, have been discouraged from participating in chess activities.

21.     Despite their August 8, 2001, resolution, the BOE has continued to allow Mehler to determine who represents Washington, D.C. at the Denker.

**Bennett speaks out illegal activities conducted by the USCF, USCCF, David Mehler, etc.**

22.    I spoke out about the fact that Defendants USCF, USCCF and Attorney David Mehler had illegally housed, and illegally profited from a museum, the "US Chess Hall of Fame", (a financial asset of the USCF). The US Chess Hall of Fame enjoyed nine years—rent and D.C. tax free—at 1501 'M' Street NW, Washington, D.C. The US Chess Hall of Fame never registered with the Washington, D.C., Department of Consumer and Regulatory Affairs, thus the museum was allowed to collect public funds and never pay taxes. The museum outgrew its nine-year, rent-free space (approximately 5,000 square foot), at 1501 'M' Street and was moved to Florida.

23.    Defendants USCCF and Attorney Mehler also run a for-profit, "gift shop", inside of the USCCF at 1501 'M' Street, charging D.C. sales taxes on items sold, (the USCCF is supposed to be a nonprofit corporation).

24.    The District of Columbia government has approved and allowed Defendants USCF, USCCF and Attorney Mehler to operate illegally collecting public funds.

25.    I exercised my right to free speech and spoke out about the fact that Defendants USCF, USCCF, and Attorney David Mehler had conspired to commit the ongoing fraud and false advertisement of Attorney Mehler's son and daughter becoming two of the world's highest rated chess players. (Due to fraud, Defendant Attorney Mehler's daughter has the highest recorded rating of any chess player ever in the history of the world; with a rating of 3019; higher than even world champions Bobby Fischer and Gary Kasparov!)

26.    The Defendants were able to accomplish this fraudulent activity by blatantly manipulating the USCF's performance evaluation system. This dastardly deed involved having two of the world's highest rated, professional chess players, Grandmasters

9

Vladimir Epishin and Alex Sherzer, intentionally lose chess games to Mehler's son and daughter. [A chess grandmaster is at the National Basketball Association (NBA), National Football League (NFL) and Major League Baseball (MLB) level of chess. There are less than seven hundred grandmasters in the whole world, some even as young as twelve (12) years old.] The purpose of Defendants fraudulent activities is to defraud myself and other Black African-Americans. Also, the false chess ratings were intended to secure full scholarships to Defendant UMBC for Defendant Attorney Mehler's son and daughter.

27.    I had believed the fraudulent information so much, that on or about the April 6, 2001, while meeting with Defendant Attorney David Mehler, I congratulated him (Mehler) on his daughter's success.

28.    I also spoke out about how Defendants USCCF, Attorney David Mehler and Mikell use public funds to support the USCF, USCCF and the DCCL. In particular the D.C. Public Schools permitted Defendants USCCF and Attorney David Mehler, for many years, to solicit public funds using the D.C. Public Schools name.

**The US Chess Center Foundation (USCCF) and how the USCCF is linked with the DC Government.**

29.    The USCCF is a fee-paying affiliate of the USCF. It is a nonprofit amateur and professional sport [chess] organization. The USCCF is an IRS 501 (c) (3), tax-exempt, organization. The USCCF enjoys an average total revenue of approximately $300,000. In or about 1992, the USCF was incorporated in, and licensed to operate in District of Columbia, being headquartered at 1501 'M' Street, N.W., Washington, D.C.

30.    There is a joining at the hip of the USCCF and the DC Government. The USCCF, with its almost half million-dollar budget, enjoys the benefit of significant US and DC

10

Government financial assistance in the form of tax exemption, (being recognized as an IRS 501 (c) (3), social organization), and indirect or direct receipt of federal grant funds. The USCCF enjoys the DC Government benefit of being having a twenty (20) year rent free lease (worth millions) on 13,000 square feet at 1501 'M' Street, N.W., (two blocks from the White House) because of a DC Government zoning law.

31.    The DC Government benefits from its relationship with the USCF because the USCCF takes on the DC Government duties, responsibilities, and activities of determining who will represent DC at the Denker. The USCCF The USCCF further takes on DC Government duties, responsibilities, and activities by conducting qualifying competitions that ultimately determine who will represent the District of Columbia.

**Bennett continues to exercise his right to free speech regarding racial discrimination.**

32.    I spoke out about the USCF's patterns and practices of racial discrimination that has kept Black African-Americans from being invited for over one hundred and fifty (150) years, to the US Championships (the chess equivalent to the US Masters in golf). In 2003, after over one hundred and fifty (150) years, Maurice Ashley and Stephen Muhammad were the first Black African-Americans ever to be invited to the US Championships. Additionally, I exercised my right to free speech in writing about how there is only one Black Grandmaster (Maurice Ashley) of chess in the entire world due to access being racially denied. (The world' s first Black African-American International Master, Maurice Ashley, became the world's first, and only, Black African-American Grandmaster in 1999. In 2003, Stephen Muhammad won the title of International Master and became the second Black African-American to ever obtain the title of International

11

Master. Muhammad is currently the only Black African-American International Master in the world.)

33.    I also spoke out about how the USCF's patterns and practices of racial discrimination has allowed a total of only three Black African-American children to ever be invited to represent the United States in World Youth competition, in almost two hundred (200) years, while Caucasian children have represented the US every time the US has been represented in World Youth competition.

**Defendants Retaliate against Bennett**

34.    On December 22, 2004, I was present when Defendant Attorney Mehler testified under oath in a sworn deposition that: In early June of 2001, he (Defendant Attorney Mehler) called a meeting at his place of business (Defendant United Stated Chess Center Foundation) to discuss Vaughn L. Bennett. In particular, he (Defendant Attorney Mehler) wanted to address what Plaintiff had been saying about Defendants USCF, USCCF, Mehler and how they could respond to it:

35.    Those attending the meeting of the minds that Defendant Attorney Mehler had called, were all Black African-Americans; Eugene Brown, Attorney Mehler's local business competitor; Eugene Brown's partner, former D.C. Firefighter Mike Brown; the then Director of Community and Corporate Relations for the District of Columbia Public School (DCPS), Dr. Leonard Haynes; former Georgetown University professor, Dr. Arthur Hoyte; Alfred "Butch" Hurd and Defendants Ralph Mikell (DCCL President) and Greg Acholonu. (Defendant Mikell again is the treasurer and registered agent of the USCCF and Defendant Acholonu is an employee who works for Defendant's Attorney

12

Mehler and the USCCF.) As a result of "spokes" coming together at this meeting, the conspiracy to retaliate against the Plaintiff was hatched.

36.    Ultimately the defendants struck back at Plaintiff, by creating and spreading a false defamatory story about the Plaintiff. The "hub" went about defaming the Plaintiff by calling him (the Plaintiff) a "vicious thug with a substantial history of dishonesty."

37.    Upon information and belief, in July of 2001, Defendant Attorney David Mehler told Defendants Mikell and Acholonu, to write letters containing the story that was created at the meeting. The defamatory letters that Defendants Mikell and Acholonu wrote in or about July 2001 for Defendant Attorney Mehler, accused the me of a fictitious 1989 crime of criminal conspiracy for which he was never charged. In fact, by writing their letters, Defendants Acholonu and Mikell created the only "documentation", of this 1989 criminal conspiracy, that exists to this date. As a result of his treasurer/registered agent and employee writing a false, defamatory story about Plaintiff, Defendant Attorney Mehler has perpetuated this same story to support his defamatory claim that I am a "vicious thug with a substantial history of dishonesty."

38.    . On August 4, 2001 Defendants USCCF and Attorney Mehler retaliated against me by writing and sending emails that included several false and defamatory statements about me. This email was posted, (and still is posted) on the website, www.thechessdrum.net The defamatory email about Plaintiff is still accessible and visible to millions of viewers. Language stating, but not limited to, I was "a vicious thug with a substantial history of dishonesty" was in the content of the emails that Defendant Mehler wrote.

**Plaintiff is denied business opportunity by Defendants USCF, USCCF, and Mehler.**

39.    On or about October 2002, while at Gonzaga High School, while attending, the D.C. Open, (a USCF sanctioned chess tournament) I requested the USCF certified national tournament directing services of Mike Atkins. I approached Atkins while he was in the performance of his official USCF duties, running the D.C. Open. I made this request to Atkins in order to pursue a business opportunity in which I would host a USCF sanctioned tournament with one thousand (1000) children participating. Atkins, (while in performance of his USCF duties), immediately refused to officiate any of my tournaments, because of what Defendant Attorney Mehler had said about me.

40.    Also while at the D.C. Open chess tournament held on or about October 2002, in Washington, D.C., at Gonzaga High School, (a prestigious high school in D.C.) I met Ms. Tobin, Gonzaga's librarian. I dialogued with Ms. Tobin about chess. I informed Ms. Tobin about the full scholarships to college that the children could win playing chess; I also spoke about my work with "at-risk" children across Washington, D.C. I shared with Ms. Tobin that I taught chess to children in the esteemed afterschool program, the "Higher Achievement Program" (HAP), (the headquarters of HAP is on the Gonzaga High School campus). Ms. Tobin was excited and invited me to come and teach chess to children at Gonzaga, offering to compensate me. It is my belief that, upon proper discovery, Ms. Tobin will disclose that what Defendant Mehler and his workers (who were present when I spoke to Ms. Tobin) said about me, influenced her to not return my calls and renege on her invitation to me.

**The USCF's racially discriminatory performance evaluation system.**

41.    As I began to research the statistics on Black African-American chess players, I discovered that the chess performance evaluation system was racially being used to keep

14

myself and other Black African-Americans at the lowest levels of chess, while Caucasian

chess players are given the opportunity to reach the highest levels. I also discovered that

the USCF had racially utilized their chess rating/evaluation system to drop my chess

rating/evaluation down over two hundred points. The USCF performance evaluation

system permits discrimination on the basis of race and color in evaluations/chess-ratings

where scholarships, cash prizes, master titles, as well as further advancement within the

sport of chess, are based on evaluations/chess-ratings pursuant to USCF written policies.

The undue discretion of tournament directors and tournament organizers is the direct

cause of me and other Black African-American adults and children receiving lower

ratings than Caucasians, and fewer high ratings. When I joined the USCF in the year

2000, my USCF performance evaluation was over two hundred points lower than when

he was last a member of the USCF, with no explanation. Caucasian chess players are not

subjected to the lowering of their performance evaluation, with no explanation. There is

no factor (such as age, experience, or similar factors) that could explain this race based or

color based difference in performance evaluations.

**Defendants USCF, MCA, and Sachin K. Singhal's blatant act of racism against the
Plaintiff and Black African-American children.**

42.    In November of 2003, Defendant Singhal, while acting in his capacity as a USCF

tournament director, chose to give my team and I a second place trophy; intentionally

denying us the first place trophy that we had rightfully earned. Defendant Singhal racially

discriminated by wrongfully awarding a team of Caucasians the first place trophy that my

team and I deserved. We were the only Black African-Americans that participated in the

tournament, and had the best record of the Middle School teams. There is no factor (such

as age, experience, or similar factors) that could explain this race based or color based

difference in denying Plaintiff and his team the first place trophy.

**Plaintiff and Howard University chess team are discriminated against by the USCF, et al.**

43.    In 2003, while at the Pan American Collegiate Chess Championships

(Pan Ams), the Howard University chess team was intentionally cheated by the USCF's

performance evaluation system, due to racial discrimination. The USCF used false

performance evaluations to keep HU out of placing in a higher category. Plaintiff was the

coach of the HU chess team in 2003. There is no factor (such as age, experience, or

similar factors) that could explain this race based or color based difference in denying

Plaintiff and his HU team the opportunity to place in a higher category.

**How the racism continues to affect Bennett.**

44.    I am affected by the USCF's racist scheme because my Black African-American

and Vietnamese students, that would have won chess scholarships, were and are being

denied access to chess tournaments where they would have won scholarships; while

Caucasian students of Caucasian chess coaches were given access. This racially

discriminatory policy has negatively affected my ability to do the business of teaching

chess, as my students are subjected to a racist glass ceiling on their opportunities to

benefit professionally and educationally.  As a result of the glass ceiling my students

have been and are being discouraged from playing chess (while Caucasian students are

encouraged to play). Ultimately, as a result, my credibility as an instructor, coach, and

chess promoter was and is negatively affected. I have suffered by not being able to

continue teaching, coaching, and promoting chess, because my students, due to the racist

system, have been discouraged from participating in chess activities.

16

**Defendants USCF, Vasserstein, Just, Clark, BMR Design, Chess Central, and Boyd
Reeds Blatant racial Animus and Wheel Conspiracy to Defame Bennett**

45.     On Sunday evening November 14, 2004, at approximately 4:40pm, while at the
National Youth Action Championships (NYAC) chess tournament, in Hershey, PA, the
constitutional and civil rights of several African-American children, youth and adults
(including plaintiff) were violated. In particular, while Plaintiff, was standing in the
spectator area with about one hundred (100) other parents and coaches (Plaintiff was the
only Black African-American among them) watching the children play chess during the
ninth and last round of a three-day tournament. Plaintiff was watching several games,
particularly the game of his (Plaintiff's) student (who was one of just ten Black African-
American children, out of approximately six hundred children, that played in the
NYAC!).

46.     USCF Tournament Director Defendant Gregory Vasserstein, (A Caucasian who
says that he coaches the Penn State University chess team.), approached Plaintiff and
said, "I'm going to have to ask you to leave the room." Plaintiff Bennett said, "For what?
I haven't done anything!" Vasserstein said, "I need you to leave the room." The Plaintiff
said "Why?" Vasserstein responded, "He [referring to the Plaintiff's student's opponent]
said you are annoying him by standing here so I would like you to leave." The Plaintiff
said, "I haven't done anything, I'm watching the games just like everyone else, behind
the [spectator] line." Then Vasserstein said, "So you're not gonna leave?" The Plaintiff
said, "No." Vasserstein walked away and the Plaintiff continued watching the game.

47.     Less than two minutes later, the USCF chief tournament director of the NYAC,
Tim Just (a large Caucasian man, approximately six (6) feet tall weighing about 300
pounds.), approached the Plaintiff and said, "I want you out of here right now." The

17

Plaintiff told him "I have not done anything and I have a right to be here just like everyone else." Defendant Just blatantly expressing his racial animus said, "I telling you to leave nigger or I'm going to call the police." Plaintiff said, "I am not leaving." He (Just) walked away, near the entrance of the room, came back about thirty seconds later and told the Plaintiff that if he (the Plaintiff) didn't leave that he (Just) was going to forfeit the Plaintiff's student's game. Defendant Just turned around, walked to the table of the game that the Plaintiff's student was playing, and stood at the edge of the table, between the two boys, with his back to the Plaintiff, completely blocking his (the Plaintiff's) view of the game. (The Plaintiff's student later told him [Plaintiff] that Mr. Just was so close to their table that his "stomach hung over the chess clock" that they [Plaintiff's student and his opponent.] needed to push on each move.)

48.     The Plaintiff went outside the playing hall and asked some of the Caucasian and Black African-American parents that Plaintiff knew, to come inside to witness what was taking place. When the Plaintiff went back inside the room accompanied by the parents, the Plaintiff stood legally in the spectator area almost exactly where he had initially been when approached by Vasserstein and Just. After about fifteen (15) seconds Mr. Just suddenly wheeled around and yelled, "If you [Plaintiff] don't leave this room in ten seconds I'm going to forfeit this game! Ten! Nine! Eight! Seven! Six! Five! Four! Three! Two! One! This game is forfeited!" and while thrusting his right arm down and pointing his index finger, almost hitting the Plaintiff's student's face, he yelled even louder, "You lose because he won't leave the room! [Turning and pointing at the Plaintiff who was still in the spectator area.] Just spun back around, putting his finger in the child's face again, and yelled, "Your whole team is forfeited!" The Plaintiff's student (who was still sitting

in his chair) looked bewildered and scared. The Plaintiff, who felt that his student was in

imminent mental and physical danger from Defendant Just, stepped across the spectator

line in an attempt to protect the child. During the process of coming in between the

Plaintiff's student and a visibly animated and still towering Defendant Just, the Plaintiff

seized the bottom of Defendant Just's left elbow with the open palm of his (Plaintiff's)

right hand, pushed his (Just's) elbow across the front of his chest and moved Defendant

Just approximately three feet away from the Plaintiff's student.

49.    Ms. Willette Seaward, (mother of the student whom Defendant Just had

forfeited and intimidated); after ensuring her son's safety; stood in the middle of the

tournament room and screamed, "The United States Chess Federation is a racist

organization!"

50.    The Hershey Park Police arrived took the Plaintiff into room, questioned the

Plaintiff and issued a citation to the Plaintiff for pushing, later, the Hershey Park Police

withdrew the citation. The Hershey Park Police "detained" Defendant Just and issued

Defendant Just a citation for his behavior and language.

51.    Upon information and belief Defendant Tim Just conducted a "meeting of the

minds" via (including but not limited to) emails in order to conspire, with Defendants

USCF, Goicherg, Chess Central, Wayne Clark, BMR Design, Boyd M. Reed, Attorney

David Mehler and several other Caucasian members of the USCF, to defame Plaintiff. On

November 16, 2004, Defendant Tim Just wrote a letter to USCF containing false and

defamatory statements. Defendant Just falsely stated that the Plaintiff, "attacked",

"assaulted" and "punched", him while at the National Youth Action chess tournament.

Defendant Just further falsely postulates that the Plaintiff was bothering a child by;

19

standing close to the child; "making faces" at the child; and exhibiting "constant loud

behavior" all while the child was playing against the Plaintiff's student.

Defendant Just also wrote that, "This man should have his membership suspended." and

that, "This man should be barred from all scholastic events." (According to USCF policy,

if a member is suspended he/she loses all of his/her rights to facilitate or participate in

any USCF activity. Also, the suspended member cannot be present at any USCF activity,

which would directly affect Plaintiff's role as D.C. delegate to the USCF.) The

aforementioned Defendants have conspired to defame the Plaintiff and have Plaintiff be

suspended from the USCF due to racial discrimination and retaliation.

52.      Upon information and belief Defendant Tim Just instructed Defendants Chess

Central, Wayne Clark, BMR Design, and Boyd M. Reed to write letters to support his

false defamatory story about the Plaintiff.

53.      Ultimately, as an end result of the racist conspiracy to defame Bennett in

retaliation for his speaking out against racism, Defendants have suspended Bennett from

the USCF.

**Conclusion**

54.      As a result of the USCF's continuing system of race discrimination, my

constitutional and civil rights have been violated. Additionally, as a result, I have suffered

and continue to suffer mental anguish, emotional pain and suffering, feeling of paranoia,

feelings of distrust, depression, sleep deprivation, nightmares when able to sleep, loss of

consortium, sexual dysfunction, personality disorder, anxiety attacks, interference with

life's daily activities, loss of enjoyment of life, humiliation, embarrassment, loss of

20

positive reputation that I have worked my whole life to build, negative changes in my relationships with family and friends, and inconvenience.

55.    I believe that, unless prevented by this Honorable Court, Defendants USCF, Brownscombe, Goichberg, Just, Reed, Redman, and Vasserstein will continue their ongoing campaign of racism and discrimination, causing me even more serious harm than has so far been the case. Additionally, I am concerned for the rights of the children, who are clearly very distressed by what has been going on. I therefore respectfully ask this Honorable Court to grant me the relief set out in my present application.

56.    I solemnly affirm under the penalties of perjury and upon personal knowledge that the foregoing facts are true.

Vaughn Lee Bennett, *pro se*
2520 10th Street, NE, #27
Washington, D.C. 20018
(202) 351-2627

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing AFFIDAVIT was mailed, first class and postage prepaid this 31st day of January, 2006 to:

Colleen Durbin, Esquire
1615 'L' Street, N.W., Suite 500
Washington, D.C. 20036

Vaughn Lee Bennett